UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN

JAMES MARCH,

        Plaintiff,

    v.                                        Case No. 23-C-656

TOWN OF GRAND CHUTE, RONALD WOLFF,
JASON VAN EPEREN, and JEFFREY INGS,

        Defendants.

**DECISION AND ORDER ON CROSS-MOTIONS FOR SUMMARY JUDGMENT**

        James March filed this action against the Town of Grand Chute and three members of its Board of Supervisors: Ronald Wolff, Jason Van Eperen, and Jeffrey Ings, under 42 U.S.C. § 1983, alleging that they violated his First Amendment and due process rights by terminating his position as Town Administrator in retaliation for his cooperation with a criminal investigation of the individual defendants' alleged misconduct.  Wolff countered with his own § 1983 claim, alleging that March had violated his First Amendment rights by setting him up for a criminal investigation in retaliation for Wolff's political activity.  Wolff also alleges that March's conduct violated his right to equal protection of the law in violation of the Fourteenth Amendment.  The court has jurisdiction under 28 U.S.C. § 1331, and the case is before the court on Defendants' motion for summary judgment on March's claims against them, including Wolff's separate motion for summary judgment, and March's motion for summary judgment on Wolff's counterclaims.  For the reasons set forth below, summary judgment will be granted on all claims and the case will be dismissed in its entirety.

# BACKGROUND

The Town of Grand Chute is located in Outagamie County, Wisconsin, and has a population of roughly 23,000. It is governed by a five-member Board of Supervisors, one of whom serves as Chairperson. In 2008, the Town hired James March as Town Administrator pursuant to Wis. Stat. § 60.37(3). As Administrator, March was the highest unelected official in the Town and was "to oversee all Town functions and Utility operations, implement Town Board policies, administer Town services, and coordinate Town functions and operations with other agencies and units of government." Dkt. No. 26-1 at 10. Among the "Essential Duties and Responsibilities" listed in his contract were the following:

> Develops and recommends policies for providing Town services.
>
> Acts as Town liaison to other agencies and units of government.
>
> Develops and administers personnel policies.
>
> Attends and participates in Town Board and other constituted Town Commission, Board, and Committee meetings. Prepares and submits reports regarding Town government and utility activities. Provides recommendations to the Board and other duly constituted Commissions, Boards, and Committees.
>
> Represents the Town to the public and developers regarding proposals, requests for services, and requests for information.
>
> . . .
>
> Develops and reviews annual budget. Prepares budget reports, monitors expenditures, recommends staffing and expenditure levels.
>
> . . .
>
> Maintain knowledge of County, State, and Federal legislation affecting Town; availability of County, State, and Federal funding for Town functions; budget development and administration principles; and Town and area development trends.

*Id.*

2

In 2019, Wolff joined a group of Grand Chute residents in opposing what they viewed as unreasonably high special assessments that the Town had been levying on property to fund street improvement and infrastructure projects. Wolff participated in several lawsuits challenging various assessments on his own property. Wolff, along with Van Eperen and Ings, then ran for and won seats on the Town Board in 2020 and 2021 on the issues of special assessments and fiscal mismanagement, giving them majority control. Prior to Wolff's election to the Board, March conveyed to Susan Brinkman, the Town's Human Resources Director, that he had heard that, if Wolff was elected to the Town Board, then Wolff planned to fire him, along with Brinkman and Director of Public Works Katie Schwartz. Dkt. No. 116 ¶ 118. After the election of Wolff and his allies, Van Eperen became Chairman of the Board. Dkt. No. 89 ¶ 7. Brad Gehring, whom Wolff viewed as the leader of the faction opposing his reform efforts, held the fourth seat on the Board, and Walter Nocito held the fifth. *Id.* ¶ 9; Dkt. No. 109-16 at 3. Gehring had previously served as Outagamie County Sheriff for roughly twenty-eight years. *See* Dkt. No. 109-1 at 3.

The job of a Town Supervisor is part-time. Prior to his election to the Town Board, Wolff owned and operated Lake Shore Cleaners, Inc., a company that does landscape work in the Grand Chute area. Dkt. No. 116 ¶¶ 6, 8. He continued to operate his business for some time after his election. Ings was an employee of Lake Shore. *See* Dkt. No. 93-1 at 7. Over the years, Lake Shore frequently performed landscaping work as a subcontractor for McMahon Engineering. McMahon on occasion performed engineering work for Grand Chute. On May 5, 2021, shortly after he was sworn in as a new Town Supervisor, Wolff received from McMahon a request for a bid from Lake Shore for site preparation and seeding for the Grand Chute Champion Pond Project. Dkt. No. 116 ¶ 16. Wolff submitted a quote on behalf of Lake Shore for the pond work and vegetation planting at a cost of $26,856.09. *Id.* ¶ 18. On May 27, 2021, McMahon advised Wolff

that Lake Shore's quote had been approved by Grand Chute and directed the company to start administering herbicide at the site. *Id.* ¶ 22.

Under Wisconsin law, a public officer or employee commits a felony if, in his or her private capacity, he or she:

> negotiates or bids for or enters into a contract in which the officer or employee has a private pecuniary interest, direct or indirect, if at the same time the officer or employee is authorized or required by law to participate in the officer's or employee's capacity as such officer or employee in the making of that contract or to perform in regard to that contract some official function requiring the exercise of discretion on the officer's or employee's part.

Wis. Stat. § 946.13(1)(a). Contracts "that do not involve receipts and disbursements by the state or its political subdivision aggregating more than $15,000 in any year" are excepted, § 946.13(2)(a), and any contract entered into in violation of the statute "is void and the state or the political subdivision in whose behalf the contract was made incurs no liability thereon," § 946.13(3). The Wisconsin Supreme Court has held that a violation of § 946.13(1) is a strict liability offense. *State v. Stoehr*, 134 Wis. 2d 66, 82, 396 N.W.2d 177 (1986).

Although there is evidence that March provided Wolff materials specifically advising him of this statute as part of his orientation as a new Board member, Wolff denies that he knew of the provision when he submitted the bid on behalf of Lake Shore and no one on the Town staff, including March, brought it to his attention. There was some discussion among the Town's staff concerning the propriety of the bid. It also appears that the Town's attorney was asked whether the landscape work was a statutory public works project requiring public bidding. The attorney advised Deputy Public Works Director Karen Heyrman that it was not and that, in any event, no other bids were received, the bid was close to the estimate, and Lake Shore was qualified to perform the work. He said nothing about any potential problem under § 946.13. Dkt. No. 77-16.

4

March claims that Wolff told him he had or was in the process of divesting himself of any interest in Lake Shore and selling the company to his son.

In any event, Lake Shore's quote was formally taken up at a joint meeting of the Grand Chute Board and Sanitary District on June 1, 2021. The quote, which Wolff had signed as president of Lake Shore, was included with the agenda items compiled by the Town staff. The minutes of the meeting reflect that Gehring asked whether the job had been bid out but was informed by the Director of Public Works that the Lake Shore proposal was the only one received back and, since it was a maintenance item, no formal proposals were needed. Gehring, together with a member of the Sanitary District, then moved to approve Lake Shore's quote. Wolff and Ings abstained, but the motion still carried. The minutes reflect that March was present but did not offer any advice or comment on the Lake Shore bid. Dkt. No. 77-17.

Sometime in the fall of 2021, Gehring filed a complaint with the Town Clerk challenging Wolff's residency and thereby his eligibility to serve as a Town Supervisor. *See* Dkt. No. 108 ¶ 15. Gehring had previously contacted the Outagamie County District Attorney about the matter and was referred to the Public Integrity Unit of the Wisconsin Department of Justice (DOJ). After the Town Clerk rejected his challenge to Wolff's residency, Gehring contacted the Wisconsin DOJ. On October 4, 2021, Gehring met with Special Agent Jay Yerges of the DOJ's Division of Criminal Investigation (DCI) and conveyed to him the evidence he had gathered that he believed showed that Wolff had lied under oath about being a resident of Grand Chute in the legally required filings for his candidacy. Gehring also advised Agent Yerges about his concerns that Wolff, Van Eperen, and Ings had privately discussed Town matters outside of official meetings, in particular, the pending litigation by Wolff and others over special assessments; that Ings had revealed to Wolff and others private information concerning the mediation of those claims; and that Wolff's

company had entered into a contract with the Town under which it was to receive a substantial sum of money. Dkt. No. 109-46.

Later that same day, Agent Yerges also interviewed March. The interview with March took place in March's office at the Grand Chute town hall during normal business hours. *Id.* According to Agent Yerges' report, March conveyed essentially the same concerns Gehring had, including information relating to the Town's ongoing civil litigation being "leaked"; certain Supervisors (Wolff, Van Eperen, and Ings) partaking in "walking quorums" in violation of Wisconsin's Open Meetings law, Wis. Stat. §§ 19.81 *et seq.*; Wolff's use of a personal email address to conduct Town business; Lake Shore's business dealings with the Town; and Wolff's residency. Dkt. No. 109-47 at 1–6. Agent Yerges followed up with March on October 27, 2021. *Id.* at 7. The record indicates that March met with and exchanged emails with Agent Yerges on several other occasions in 2022 and 2023.

As 2021 rolled over into 2022, the DCI investigation continued. On March 22, 2022, Agent Yerges executed a search warrant on Wolff's home and properties. *See* Dkt. No. 78 ¶ 22. Wolff later filed a separate § 1983 action against Agent Yerges in the Western District of Wisconsin, claiming that the search warrant was unconstitutionally vague and overbroad, and that Yerges and other law enforcement officers had executed it in an unconstitutional manner. According to the decision dismissing Wolff's lawsuit against Agent Yerges on ground of qualified immunity, the warrant authorized the seizure of documents, computers, including computer hardware devices, internal and external drives, routers, modems, storage devices, and related manuals evidencing or tending to evidence possible misconduct in office. *Wolff v. Virgil*, No. 22-cv-127-wmc, 2023 WL 8233136, at *2 (W.D. Wis. Oct. 23, 2023). Among the items seized by the officers executing the warrant were "a credit card, divorce and custody paperwork, addresses of family and friends,

dental work records, printed emails about a family reunion and a baby shower in 2018, printed emails about life insurance policies dated from 2015, an unemployment file, and many business records (most specifically, those for 'Willow Lane Assisted Living') that had nothing to do with the topics specified in the warrant." *Id.* at *3. The same day he executed the search warrants on Wolff's properties, Agent Yerges interviewed Wolff, Van Eperen, and Ings concerning the reports involving them he had received from Gehring and March. Dkt. No. 89 ¶¶ 18–20; *see* Dkt. Nos. 109-8 at 1, 109-53 at 1, 109-2 at 1.

In the wake of the search of Wolff's properties, Wolff, Van Eperen, and Ings sought to investigate the origins and progress of the DCI investigation. *See* Dkt. No. 112 ¶¶ 27–30. Specifically, on April 14, 2022, Van Eperen emailed Town Clerk Angie Cain to add an agenda item to the upcoming Board meeting; the item was to be titled, "Investigation into the events that led up to the March 2022 state investigation of Town Board members." Dkt. No. 111-1. On April 18, 2022, Ings and Nocito traveled to Milwaukee to submit a complaint with the Federal Bureau of Investigation's (FBI) Milwaukee Field Office. Dkt. No. 109-25 at 1. The complaint expressed general concerns about the DCI investigation and that it might have been instigated by corrupt public officials. *Id.* The next day, Wolff sent an email to March expressing serious displeasure with the search of his properties and asserting that the investigation was smearing the names of Board members. Dkt. No. 111-2. Wolff closed the email with the following: "If the town will not do a [sic] investigation others will. More than frustrated." *Id.*

It appears clear that by this time or shortly thereafter, Wolff, Van Eperen, and Ings were aware that March had been interviewed by Agent Yerges and was providing him information because Gehring stated as much at a Board meeting. Dkt. No. 79-10 at 3. In June 2022, Van Eperen requested March's employment agreement from Director of Human Resources

Brinkman.  Dkt. Nos. 98-1 at 15; 87-5 at 40–41.  Van Eperen asserts that his reason for requesting March's employment agreement was to better understand how past Boards had interacted with March and the agreement's "buy out" clause.  Dkt. No. 87-5 at 40.  March's employment agreement provided that his term was indefinite, subject to removal by a two-thirds vote of the Board.  The agreement further provided:

> 1.      Employee shall hold office as Town Administrator for an indefinite term, subject to removal at any time by two-thirds vote of the entire Board of Supervisors.
>
> . . .
>
> 3.      If termination is without cause, Employee shall receive written notice of termination thirty days prior to termination. . . .  If termination without cause occurs during the fourth or succeeding years of employment, Employee shall receive six additional months' salary and family health insurance coverage as severance compensation and any accrued benefits at the time of termination.

Dkt. No. 79-1 at 1–2.  At some point, Wolff requested March's employment agreement from Van Eperen so that he could share it with his personal attorney.  Dkt. No. 87-5 at 41.

In December 2022, Ings sent a letter to Attorney General Josh Kaul, expressing concern over the origins of the DCI investigation, suggesting that it could have been motivated by a personal vendetta, and requesting any information on the progress of the investigation.  Dkt. No. 79-8 at 2–3.  Also in the final days of 2022, the Board assigned certain goals for March to work towards in 2023.  On January 10, 2023, March emailed the entire Board a progress report on his goals and indicated he would provide quarterly progress updates.  March further expressed that he found the goal system productive.  Ings responded, "Thanks for the update.  Good report!"  Dkt. No. 79-9.

On February 11, 2023, Wolff, Van Eperen, and Ings met with Michael Koles, Executive Director of the Wisconsin Towns Association.  Dkt. No. 109-37 at 3.  The trio met with Koles again on March 9, 2023.  *Id.* at 4.  During that meeting, Koles was asked to provide a

8

recommendation for an attorney experienced in resolving personnel issues and conflicts. Wolff, Van Eperen, and Ings also expressed to Koles that they were frustrated with the ongoing DCI investigation and with March as they felt his salary was too high. *Id.* at 4–5. On April 11, 2023, the Board convened during a special meeting to discuss retaining Attolles Law, S.C., a law firm that specializes in representing local governments, as independent counsel to review March's employment agreement. In the discussion leading up to the vote, Van Eperen noted that March had met all his goals but that there were other concerns like salary. Van Eperen also noted that March was the only Town employee over which the Board had direct control. The Board ultimately voted to retain the Attolles law firm by a vote of four to one; Gehring was the lone dissenter. Dkt. No. 79-10 at 1–3. On April 13, 2023, the Board convened for another special meeting. The meeting agenda noticed that the Board would meet in closed session to discuss "the performance of the Town Administrator, confer with special counsel regarding the Town's rights and responsibilities under the employment agreement with the Town Administrator and otherwise discuss the Town Board's legal position in relation to the same." Dkt. No. 79-11.

On May 2, 2023, the Board convened for a regular meeting to discuss the same agenda item. After tending to normal business, the Board convened in closed session for roughly one and one-half hours. Upon reconvening in open session, the Board voted by supermajority—Wolff, Van Eperen, Ings, and Elizabeth English (who had replaced Nocito) in favor; Gehring opposed— to terminate March's employment agreement. Dkt. No. 79-13 at 1, 5; Dkt. No. 108 ¶ 91. Following the vote, Gehring commented that March's termination was "the most disgusting thing he has ever been a part of" in his 30 years in government. Dkt. No. 79-16 at 5. Van Eperen delivered a termination letter to March the next day, notifying March that his termination would be effective on June 2, 2023, and he would receive six months' pay and certain benefits pursuant

9

to the terms of his employment agreement. Dkt. No. 108 ¶¶ 92–93. At Board meetings on May 16, 2023, and June 6, 2023, English moved to reconsider and discuss rehiring March as Administrator but was unsuccessful. Dkt. No. 122 ¶ 77.

On May 25, 2023, before his termination became effective, March brought this action against the Town of Grand Chute, Wolff, Van Eperen, and Ings, alleging that the termination of his employment was in retaliation for his exercise of rights protected by the First Amendment and the Due Process Clause of the Fourteenth Amendment. In the meantime, on July 10, 2023, Wolff was charged in Outagamie County Circuit Court with violating Wis. Stat. § 946.13(1)(a) by bidding for the landscaping portion of the Champion Pond Project. Dkt. No. 32-2. (The case later went to trial, and an Outagamie County jury returned a verdict of not guilty.) On December 1, 2023, Wolff, in turn, filed a counterclaim against March, alleging that March had engineered the criminal charge against him in retaliation for Wolff's political activity in Grand Chute, thereby violating his First Amendment right to free speech and his Fourteenth Amendment right to equal protection of the law under the "class of one" theory endorsed by the Supreme Court in *Village of Willowbrook v. Olech*, 528 U.S. 562 (2000) (per curiam).

## LEGAL STANDARD

Summary judgment is appropriate when the movant shows there is no genuine issue of material fact, and the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). "Material facts" are those under the applicable substantive law that "might affect the outcome of the suit." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A dispute over a "material fact" is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the non-moving party." *Id.* In deciding a motion for summary judgment, the court must view the evidence and make all reasonable

inferences in the light most favorable to the non-moving party. *Johnson v. Advoc. Health & Hosps. Corp.*, 892 F.3d 887, 893 (7th Cir. 2018) (citing *Parker v. Four Seasons Hotels, Ltd.*, 845 F.3d 807, 812 (7th Cir. 2017)). "The nonmoving party must do more than simply show that there is some metaphysical doubt as to the material facts;" instead, it must "submit evidentiary materials that set forth specific facts showing that there is a genuine issue for trial." *Siegel v. Shell Oil Co.*, 612 F.3d 932, 937 (7th Cir. 2010) (citations omitted). Summary judgment is properly entered against a party "who fails to make a showing to establish the existence of an element essential to the party's case, and on which that party will bear the burden of proof at trial." *Austin v. Walgreen Co.*, 885 F.3d 1085, 1087–88 (7th Cir. 2018) (citing *Celotex Corp.*, 477 U.S. at 322).

## ANALYSIS

### A.    Defendants' Motions for Summary Judgment

#### 1.    First Amendment Retaliation Doctrine in Public Employment

In *Pickering v. Board of Education*, the Court held that a public employee does not relinquish First Amendment rights to comment on matters of public interest by virtue of government employment. 391 U.S. 563, 565 (1968). A government employer therefore cannot retaliate against public employees by terminating their employment for engaging in constitutionally protected speech. *Id.* at 574–75. The Court also recognized, however, that the State's interests as an employer in regulating the speech of its employees "differ significantly from those it possesses in connection with regulation of the speech of the citizenry in general." *Id.* at 568. The difficulty in resolving disputes over public employee retaliatory discharge cases is in "arriving 'at a balance between the interests of the [employee], as a citizen, in commenting upon matters of public concern and the interest of the State, as an employer, in promoting the efficiency of the public services it performs through its employees.'" *Connick v. Myers*, 461 U.S. 138, 140

11

(1983) (alteration in original) (quoting *Pickering*, 391 U.S. at 568). In its effort to balance these two interests, the Court has determined that whether a public employee's speech/expression is protected depends on what was said and the role of the speaker.

To establish a First Amendment retaliation claim, a public employee must show that "(1) she engaged in constitutionally protected speech; (2) she suffered a deprivation because of her employer's action; and (3) her protected speech was a but-for cause of the employer's action." *Diadenko v. Folino*, 741 F.3d 751, 755 (7th Cir. 2013); *see also Kidwell v. Eisenhauer*, 679 F.3d 957, 965 (7th Cir. 2012) ("Initially, to establish a prima facie case of retaliation, the plaintiff must produce evidence that his speech was at least a motivating factor . . . of the employer's decision to take retaliatory action against him. Then, the burden shifts to the employer to rebut the causal inference raised by the plaintiff's evidence. If the employer fails to counter the plaintiff's evidence, then . . . the plaintiff has established the but-for causation needed to succeed on his claim." (citations omitted)).

While First Amendment retaliation claims in the context of government employment usually involve controversial comments by employees in the workplace or directed to the media, the same analysis applies to speech contained in lawsuits, petitions, or other political activity. *Hagan v. Quinn*, 867 F.3d 816, 823 (7th Cir. 2017) ("[F]or purposes of assessing these plaintiffs' First Amendment retaliation claims, it makes no difference that plaintiffs' expressive activity took the form of a complaint in federal court rather than a conversation in the workplace, a press conference, a Facebook post, or a tweet on Twitter." (citing *Borough of Duryea v. Guarnieri*, 564 U.S. 379, 395–97 (2011))). Plaintiffs can prevail in such lawsuits only if they can show that the but-for cause of their termination was "protected speech/petitioning activity." *Id.*

12

The *Connick-Pickering* line of cases require that, in order to be constitutionally protected, the public employee's speech must be made as a citizen about a matter of public concern. *Hagan*, 867 F.3d at 822. "[W]hen a public employee speaks not as a citizen upon matters of public concern, but instead as an employee upon matters only of personal interest, absent the most unusual circumstances, a federal court is not the appropriate forum in which to review the wisdom of a personnel decision taken by a public agency allegedly in reaction to the employee's behavior." *Connick*, 461 U.S. at 147. In *Garcetti v. Ceballos*, the Court further clarified that "when public employees make statements pursuant to their official duties, the employees are not speaking as citizens for First Amendment purposes, and the Constitution does not insulate their communications from employer discipline." 547 U.S. 410, 421 (2006). This follows because "[g]overnment employers, like private employers, need a significant degree of control over their employees' words and actions; without it, there would be little chance for the efficient provision of public services." *Id.* at 418–19 (citing *Connick*, 461 U.S. at 143 ("[G]overnment offices could not function if every employment decision became a constitutional matter.")).

In another line of cases, the Court has held that non-policymaking public employees may not be discharged simply because they are not members of the same political party as those elected to hold power. *Elrod v. Burns*, 427 U.S. 347, 373 (1976); *Branti v. Finkel*, 445 U.S. 507, 518 (1980). A corollary of the *Elrod-Branti* line of cases, however, is that employees who have policymaking roles in government can be terminated for engaging in speech, even if it is about a matter of public concern, if it is "critical of superiors or their stated policies." *Hagan*, 867 F.3d at 826 (quoting *Kiddy-Brown v. Blagojevich*, 408 F.3d 346, 358 (7th Cir. 2005)). The rationale for this second line of cases is to avoid situations in which elected officials could be "undercut by tactics obstructing the implementation of policies . . . presumably sanctioned by the electorate."

*Elrod*, 427 U.S. at 367 (plurality opinion). The concern "is with the effects on the operations of government of forcing a public official to hire, or retain, in a confidential or policymaking job, persons who are not his political friends and may be his political enemies." *Wilbur v. Mahan*, 3 F.3d 214, 217–18 (7th Cir. 1993). Under these circumstances, "[the public employee's] First Amendment rights may be required to yield to the State's vital interest in maintaining governmental effectiveness and efficiency." *Branti*, 445 U.S. at 517.

The Seventh Circuit has recognized that "in cases involving the dismissal of an employee in a policymaking position, there is no need for a fact-specific analysis of the circumstances of each case mandated by *Pickering*." *Kiddy-Brown*, 408 F.3d at 358 (citation omitted); *see also Vargas-Harrison v. Racine Unified Sch. Dist.*, 272 F.3d 964, 971 (7th Cir. 2001) ("In essence, we have determined that, with respect to [policymaking] employees, the *Pickering* analysis regularly will result in a determination that the government employer's need for political allegiance from its policymaking employee outweighs the employee's freedom of expression to such a degree that it obviates *Pickering* balancing." (internal quotations marks and citation omitted)). But "[e]ven these policymaking employees . . . possess a minimal level of First Amendment protection against retaliatory dismissal: the government cannot fire them for speech on public matters unconnected to political affiliation or policy viewpoints." *Embry v. City of Calumet City*, 701 F.3d 231, 235 (7th Cir. 2012). Thus, there are two elements to the policymaker corollary to the *Elrod-Branti* line of cases: "First, the employee must have occupied a policy-making position. If so, his speech must have been of the kind that falls within the scope of the corollary." *Hagan*, 867 F.3d at 826 (quoting *Matrisciano v. Randle*, 569 F.3d 723, 731 (7th Cir. 2009), *abrogated in part on other grounds by Gross v. FBL Fin. Servs., Inc.*, 557 U.S. 167 (2009). If both elements are met, Defendants are entitled to judgment as a matter of law.

### 2. Application to March's First Amendment Claim

The undisputed evidence establishes that March held a policymaking position for the Town of Grand Chute. "[T]he test for determining whether a position involves policymaking is 'whether the position authorizes . . . meaningful input into government decisionmaking on issues where there is room for principled disagreement on goals or their implementation.'" *Id.* at 826 (quoting *Kiddy-Brown*, 408 F.3d at 355). March was the highest unelected official of the Town. His job was "to oversee all Town functions and Utility operations, implement Town Board policies, administer Town services, and coordinate Town functions and operations with other agencies and units of government." Dkt. No. 26-1 at 10. But he was not just to implement the Board's policies; he was to develop and recommend policies for providing Town services, as well as develop and administer personnel policies. *Id.* His position clearly falls within the policymaker element of the exception that *Elrod* and *Branti* recognized.

Examples of the types of jobs the Seventh Circuit has found to fall within the policymaking role, as recounted in *Hagan*, 867 F.3d at 827, include city commissioner of streets and allies, *Embry*, 701 F.3d at 236; senior humane officer for city board of public safety, *Davis v. Ockomon*, 668 F.3d 473, 480 (7th Cir. 2012); accounting bureau chief for state transportation department, *Allen v. Martin*, 460 F.3d 939, 945–46 (7th Cir. 2006); elementary school principal, *Vargas-Harrison*, 272 F.3d at 973; senior fiscal analyst for city block grant committee, *Bonds v. Milwaukee County*, 207 F.3d 969, 977 (7th Cir. 2000); subdistrict superintendent for state highway department, *Selch v. Letts*, 5 F.3d 1040, 1047 (7th Cir. 1993); general inspector for local health department, *Heck v. City of Freeport*, 985 F.2d 305, 310 (7th Cir. 1993); deputy sheriff, *Upton v. Thompson*, 930 F.2d 1209, 1218 (7th Cir. 1991); administrator of city parks and recreation, *Bicanic v. McDermott*, 867 F.2d 391, 395 (7th Cir. 1989); and assistant state's attorney, *Livas v. Petka*,

711 F.2d 798, 801 (7th Cir. 1983). March's job was quintessentially a policymaking position and easily fits within this group.

Turning to the second element of the policymaker corollary, the court must determine whether the evidence is sufficient to permit a finding that March's speech was nevertheless protected. March claims the individual defendants violated his First Amendment rights by terminating him from his position as Town Administrator in retaliation for his meeting with Agent Yerges and cooperating in Yerges' investigation of official misconduct by answering Yerges' questions about the individual defendants. The individual defendants contend that they did not even know what March had told Agent Yerges at the time they voted to terminate his employment and thus could not have based their decision on what he told Agent Yerges. Dkt. No. 90 at 5. They argue that they each had their own independent reasons for voting to terminate March's contract. *Id.* at 17. If true, March's First Amendment claim fails, since he has asserted no other speech that he contends was constitutionally protected.

The fact that the individual defendants deny that they had any idea what March was telling Agent Yerges and assert other reasons for their vote, however, does not mean that a jury would be required to so find. A jury would not be compelled to accept their testimony. Notwithstanding their own versions of events, the evidence is sufficient to support a finding that the individual defendants believed that March was providing information to Agent Yerges long before they voted to terminate his position with the Town on May 2, 2023. Wolff's properties were searched, and Ings and Van Eperen were interviewed by Agent Yerges on March 22, 2022. The individual defendants could have concluded from the evidence sought in the search warrant and the matters they were questioned about during the interviews that someone working for the Town was accusing them of illegal activities as Board members. They then embarked on a concerted effort

16

to find out what had led up to the DOJ's investigation. By April of 2022, they clearly knew that March had been providing information to Agent Yerges and could have reasonably concluded, or at least suspected, that the information he provided was in part what had led to the investigation and criminal charge against Wolff, especially since they viewed March as closely aligned with Gehring.

Indeed, that scenario is entirely consistent with, and forms the basis of, Wolff's lawsuit against March. Wolff argues that it was not March's mere cooperation with an independent criminal investigation that warranted his termination, but the fact that March, along with Gehring, manufactured the criminal investigation. In support of his own claim against March and in his separate motion for summary judgment, Wolff argues that March essentially set him up for criminal prosecution to have him removed from the Board by not warning him that abstaining from the vote on the Lake Shore contract was not enough to avoid criminal liability under Wis. Stat. § 946.13. Dkt. Nos. 91, 114. He notes that one of March's duties was to advise the Board on legal compliance and that it was March who compiled the materials, including information about § 946.13, that advised new Board members of legal and ethical issues that could arise while serving on the Board. Dkt. No. 114 at 2, 5. Yet, instead of bringing the matter up when the issue came for a vote at the Board meeting or suggesting that the contract be structured to avoid the full payment within a year, March said nothing and only voiced his concerns to Agent Yerges after the other Board members had approved the contract but before full payment had even been made. In fact, Wolff claims that March told him that Lake Shore's work on the Champion Pond Project would fall within an exception or "loophole" for erosion control so that Wolff would not have any problems as to compliance with § 946.13(1)(a). Dkt. No. 116 ¶ 23.

*Lane v. Franks* establishes that a public employee does have constitutional protection for testifying before a grand jury in a criminal investigation against his superiors. 573 U.S. 228, 242 (2014). In *Lane*, the former director of a community college's program for underprivileged youth brought a § 1983 action against the president of the college alleging that he had been terminated from his position in retaliation for testifying before a grand jury about the fraudulent conduct of a state representative who was on his program's payroll. *Id.* at 234. The district court granted the college president's motion for summary judgment on the ground that he was entitled to qualified immunity since a reasonable government official in his position would not have had reason to believe that the Constitution protected the plaintiff's testimony. In so ruling, the district court relied on *Garcetti*, which, as noted above, held that "when public employees make statements pursuant to their official duties, the employees are not speaking as citizens for First Amendment purposes." 547 U.S. at 421. The district court found no violation of clearly established law because the plaintiff had learned of the information that he testified about while working as the director of the program and, thus, his speech could still "be considered as part of his official job duties and not made as a citizen on a matter of public concern." *Lane*, 573 U.S. at 234–35. The Eleventh Circuit went further in affirming the district court's decision, holding that the plaintiff's testimony before the grand jury was not constitutionally protected since he was not speaking as a private citizen when he appeared before the grand jury. *Id.* at 235.

In a unanimous decision, the Supreme Court reversed and held that the plaintiff's testimony before the grand jury was constitutionally protected speech. Without addressing the question of whether the plaintiff held a policymaking position within the meaning of the *Elrod-Branti* corollary, the Court conducted its analysis under *Pickering* and focused first on the importance of such speech to the public interest in good government:

The importance of public employee speech is especially evident in the context of this case: a public corruption scandal. The United States, for example, represents that because "[t]he more than 1000 prosecutions for federal corruption offenses that are brought in a typical year . . . often depend on evidence about activities that government officials undertook while in office," those prosecutions often "require testimony from other government employees." Brief for United States as Amicus Curiae 20. It would be antithetical to our jurisprudence to conclude that the very kind of speech necessary to prosecute corruption by public officials—speech by public employees regarding information learned through their employment—may never form the basis for a First Amendment retaliation claim. Such a rule would place public employees who witness corruption in an impossible position, torn between the obligation to testify truthfully and the desire to avoid retaliation and keep their jobs.

*Id.* at 240–41.

The Court then rejected the defendant's argument that the plaintiff's speech was not as a private citizen but instead within the scope of his duties as defined by *Garcetti*. "[T]he mere fact that a citizen's speech concerns information acquired by virtue of his public employment," the Court held, "does not transform that speech into employee—rather than citizen—speech." *Id.* at 240. The Court further concluded that the form and context of the speech—sworn testimony in a judicial proceeding—fortified its conclusion that the plaintiff's speech was on a matter of public concern: "Unlike speech in other contexts, testimony under oath has the formality and gravity necessary to remind the witness that his or her statements will be the basis for official governmental action, action that often affects the rights and liberties of others." *Id.* at 241 (quoting *United States v. Alvarez*, 567 U.S. 709, 721 (2012) (plurality opinion)); *see also Chrzanowski v. Bianchi*, 725 F.3d 734, 738 (7th Cir. 2013) ("[S]peech does not 'owe[] its existence to a public employee's professional responsibilities' within the meaning of *Garcetti* simply because public employment provides a factual predicate for the expressive activity; rather, *Garcetti* governs speech that is made 'pursuant to official duties' in the sense that it is 'government employees' work product' that has

19

been 'commissioned or created' by the employer." (second alteration in original) (quoting *Garcetti*, 547 U.S. at 422)).

Turning to the question in *Pickering* of whether the government had an adequate justification for treating the public employee plaintiff differently from any other member of the public based on the government's needs as an employer, the Court noted that it had previously recognized "that government employers often have legitimate interests in the effective and efficient fulfillment of their responsibilities to the public, including promoting efficiency and integrity in the discharge of official duties, and maintaining proper discipline in public service," and that these interests can require limitations on its employee's First Amendment rights. *Id.* at 242 (quoting *Connick*, 461 U.S. at 150–51) (cleaned up). The Court also noted, however, that it had cautioned that "a stronger showing of government interests may be necessary if the employee's speech more substantially involves matters of public concern." *Id.* (quoting *Connick*, 461 U.S. at 152) (cleaned up). With these considerations in mind, the Court concluded:

> the employer's side of the *Pickering* scale is entirely empty: Respondents do not assert, and cannot demonstrate, any government interest that tips the balance in their favor. There is no evidence, for example, that Lane's testimony at Schmitz' trials was false or erroneous or that Lane unnecessarily disclosed any sensitive, confidential, or privileged information while testifying. In these circumstances, we conclude that Lane's speech is entitled to protection under the First Amendment. The Eleventh Circuit erred in holding otherwise and dismissing Lane's claim of retaliation on that basis.

*Id.* (footnote omitted). Notwithstanding its holding that the Eleventh Circuit had erred in concluding that the plaintiff's speech was not constitutionally protected, the Court affirmed the lower court's decision dismissing the claim for monetary relief against the college president on the alternative ground of qualified immunity and remanded the case for further proceedings on the remaining claims. *Id.* at 246.

20

March argues that *Lane* provides strong support for his claim that his cooperation with Agent Yerges' investigation was constitutionally protected. This case differs from *Lane* in several respects, however. First, as noted, the Court did not address whether the plaintiff was a policymaker, although based on his job title—program director—it would appear likely he was. In any event, the Court analyzed the case under *Pickering* without even discussing the *Elrod-Branti* corollary. This is significant because March held a quintessential policymaking position. For this reason, he would have less protection under the First Amendment than a non-policymaker. Also, unlike *Lane*, March's speech was critical of his direct supervisors, not someone who worked under his supervision. He essentially accused a majority of the Board of engaging in public corruption, something even more serious than accusing the governor of "an arbitrary and capricious act allowing him to take the protected property rights of plaintiffs without due process." *Hagan*, 867 F.3d at 828–29. Accusing one's supervisors of criminal conduct would make working together effectively and efficiently to fulfill their responsibilities to the public difficult. Thus, unlike *Lane*, the employer's side of the *Pickering* scale is not empty.

The most significant distinction between this case and *Lane* lies in the fact that in this case, March could have helped Wolff and the Board itself avoid or at least minimize the resulting damage and disruption that the criminal investigation brought about. In *Lane*, the plaintiff had ordered an audit to address financial difficulties the program was experiencing before he arrived and learned that a state representative on the program's payroll had not been showing up to work. 573 U.S. at 232. After the plaintiff fired the state representative, an FBI investigation led to charges against her of mail fraud and theft from a program receiving federal funds which, in turn, led to a 30-month prison sentence and restitution and forfeiture payments of $177,251.82. *Id.* at 232–33. It was the plaintiff's testimony in the criminal proceeding against the state representative

that he claimed led to his termination. There was no suggestion that the plaintiff had taken or failed to take any action that led to the criminal conduct investigated. His actions had merely uncovered a crime that had already been committed.

In this case, by contrast, the crime Wolff was accused of committing—submitting a bid for a Town project on behalf of his company—could have been informally resolved had March notified Wolff and the other Board members of the risk that he was in violation of § 946.13(1)(a) and that it was not enough for Wolff to simply abstain from voting on the matter. One of March's duties, after all, was to "[m]aintain knowledge of County, State, and Federal legislation affecting [the] Town." Dkt. No. 26-1 at 10. The fact that March reported the alleged crime to Agent Yerges several months later, even before payment was made, clearly shows he viewed Wolff's submitting a bid on behalf of his company as a crime. Yet, he said nothing to Wolff or the other Board members when the matter came before the Board for a vote. Instead, he stood by as Gehring moved for approval of the bid, even though the same statute provided that any such contract was void and the Town could incur no liability on it. Wis. Stat. § 946.13(3). This and other evidence, much of it acquired after March's termination, such as Agent Yerges' reports of interviews and March's email exchanges with Gehring, supports Wolff's contention that March was working with Gehring in opposition to the Wolff-led faction of the Board.

The court concludes from the foregoing that March's alleged speech was not constitutionally protected, given his policymaking position. This is not to deny that "[e]xposing governmental inefficiency and misconduct is a matter of considerable significance." *Garcetti*, 547 U.S. at 425. Many states, including Wisconsin, have enacted whistle-blower protection laws "to protect employees from retaliation and encourage disclosure of certain information." *Hutson v. State of Wis. Pers. Comm'n*, 2003 WI 97, ¶ 37, 263 Wis. 2d 612, 633, 665 N.W.2d 212, 222 (citing

Wis. Stat. § 230.01(2)).  But March did not bring his action under Wisconsin statutory law. Instead, he brought his action under the First Amendment relying upon the Court's analysis in *Pickering*.  The Court of Appeals has held, however, that "under the 'policy-maker corollary to the *Pickering* analysis, the First Amendment does not prohibit the discharge of a policy-making employee when that individual has engaged in speech on a matter of public concern in a manner that is critical of superiors or their stated policies.'"  *Hagan*, 867 F.3d at 826 (quoting *Kiddy-Brown*, 408 F.3d at 358).  By his own admission, March engaged in speech on a matter of public concern in a manner critical of his superiors.  Given his policymaking role, his speech was not protected.  His First Amendment retaliation claim therefore fails.

### 3.  Qualified Immunity of Individual Defendants

Although the answer filed on behalf of all Defendants asserted the affirmative defense of qualified immunity, only Wolff in the brief in support of his separately filed motion for summary judgment presents an argument for qualified immunity.  Nevertheless, under Rule 56(f), a court can decide any ground not raised by the parties as long as the parties had the opportunity to brief the issue.  Fed. R. Civ. P. 56(f).  Since March briefed the issue for one of the individual defendants and the analysis is the same for each, the court will proceed to decide whether each of the individual defendants is entitled to qualified immunity as an alternative ground for summary judgment in their favor.

"The doctrine of qualified immunity protects government officials 'from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'"  *Pearson v. Callahan*, 555 U.S. 223, 231 (2009) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)).  "Qualified immunity balances two important interests—the need to hold public officials accountable when they exercise power

irresponsibly and the need to shield officials from harassment, distraction, and liability when they perform their duties reasonably." *Id.* "The defense provides ample room for mistaken judgments and protects all but the plainly incompetent and those who knowingly violate the law." *Green v. Newport*, 868 F.3d 629, 639 (7th Cir. 2017) (cleaned up); *see also Kemp v. Liebel*, 877 F.3d 346, 350–51 (7th Cir. 2017).

A government official is protected by qualified immunity unless the plaintiff shows: "(1) that the official violated a statutory or constitutional right, and (2) that the right was 'clearly established' at the time of the challenged conduct." *Ashcroft v. al-Kidd*, 563 U.S. 731, 735 (2011) (quoting *Harlow*, 457 U.S. at 818). The rule that a government official cannot be personally liable unless the right the official is accused of violating is clearly established is basic to the essential role of the doctrine of qualified immunity. For it is fundamentally unfair to impose liability on a government official for conduct he reasonably believed he was entitled, if not required, to undertake. Fear of incurring such liability could also unreasonably deter a public officer in carrying out the duties of his office. It is for this reason that qualified immunity shields an officer from suit when making a decision that, though now found to be constitutionally deficient, was not clearly established to be so at the time. *Brosseau v. Haugen*, 543 U.S. 194, 198 (2004) ("Because the focus is on whether the officer had fair notice that her conduct was unlawful, reasonableness is judged against the backdrop of the law at the time of the conduct. If the law at that time did not clearly establish that the officer's conduct would violate the Constitution, the officer should not be subject to liability or, indeed, even the burdens of litigation.").

"To be clearly established, a right must be sufficiently clear that every reasonable official would have understood that what he is doing violates that right." *Reichle v. Howards*, 566 U.S. 658, 664 (2012) (cleaned up). "In other words, 'existing precedent must have placed the statutory

or constitutional question beyond debate.'" *Id.* (quoting *al-Kidd*, 563 U.S. at 741). In assessing whether the unconstitutionally of the conduct of an official was clearly established at the time, the Court has repeatedly cautioned lower courts against "defin[ing] clearly established law at a high level of generality." *al-Kidd*, 563 U.S. at 742 (citing *Brosseau*, 543 U.S. at 198–99). "This is not to say that an official action is protected by qualified immunity unless the very action in question has previously been held unlawful, but it is to say that in the light of pre-existing law the unlawfulness must be apparent." *Wilson v. Layne*, 526 U.S. 603, 615 (1999) (citations omitted).

Based on the analysis above, the court concludes as an alternative ground for summary judgment in favor of the individual defendants that they are entitled to qualified immunity on March's First Amendment retaliation claim because whatever constitutional protection March had was not clearly established. March argues in opposition that the law regarding his free speech rights was "well settled" at the time the individual defendants voted to terminate his contract with the Town. Dkt. No. 76 at 13. In support of his argument, March cites several cases which rejected the defense of qualified immunity by defendants alleged to have terminated the employment of government employees who reported corrupt or illegal practices. In *Gorman v. Robinson*, for example, the court rejected the defense of qualified immunity by the defendants in a civil rights lawsuit brought by an employee of the Chicago Housing Authority (CHA) who alleged that he had been discharged for his cooperation with FBI investigations of employee corruption at the CHA. 977 F.2d 350, 352 (7th Cir. 1992). But the plaintiff in *Gorman* was an assistant purchasing agent, which would not seem to be a policymaking position. More importantly, there was no discussion of the policymaker corollary to the *Elrod-Branti* line of cases. The same is true of other cases March cites in support of his contention that the law protecting him from termination for cooperating in a criminal investigation of his superiors was well established. They involve

plaintiffs who seemingly do not occupy policymaking positions and contain no discussion of the *Elrod-Branti* corollary. *See Kristofek v. Vill. of Orland Heights*, 832 F.3d 785, 790 (7th Cir. 2016) (part-time village police officer); *Hobgood v. Ill. Gaming Bd.*, 731 F.3d 635, 637 (7th Cir. 2013) (senior special agent for the investigations division of Gaming Board); *Valentino v. Vill. of S. Chi. Heights*, 575 F.3d 664, 669 (7th Cir. 2009) (plaintiff began working as part-time secretary in Village's Building Department and later transferred to water department where she performed various administrative tasks); *Spiegla v. Hull*, 371 F.3d 928, 932 (7th Cir. 2004) (correctional officer).

March also cites *Lane* as support for his contention that the law governing this case was clearly established. "[I]n *Lane*," he contends, "the U.S. Supreme Court made it clear that the key considerations in determining whether March's speech was protected are the content of his speech and the fact that it was provided to someone other than his employer." Dkt. No. 76 at 13 (citing *Lane*, 573 U.S. at 241). "Certainly, after the *Lane* decision," March argues, "no reasonable public official would believe they could lawfully retaliate against March for providing evidence to a law enforcement official at the law enforcement official's request." *Id.* at 14.

But *Lane*, like the other cases March cites, does not contain any discussion of the *Elrod-Branti* corollary that, as the court explained in *Hagan*, provides an exception that "bars plaintiffs from pursuing their First Amendment retaliation claim." 867 F.3d at 825. For this reason and because of the significant factual distinctions between this case and *Lane* described above, the court concludes that, even if it erred in concluding that March's speech/conduct was not constitutionally protected, the law was not so clearly established as to deprive the individual defendants of the qualified immunity the law provides. For this reason, as well, the individual defendants are entitled to summary judgment on March's First Amendment claim against them.

26

### 4. March's Due Process Claim Fails as a Matter of Law

March's Fourteenth Amendment claim likewise cannot survive summary judgment. March argues that although a supermajority of the Board could terminate him "without cause," he was nonetheless entitled to certain procedural safeguards before the Board could terminate him. And because those procedural safeguards were not provided, March asserts that his due process claim must be heard by a jury. Defendants disagree, asserting that March held no property interest in his employment and therefore cannot maintain a due process claim. Defendants are correct; March's due process claim must be dismissed.

The Due Process Clause of the Fourteenth Amendment forbids a state from depriving "any person of life, liberty, or property without due process of law." U.S. Const. amend. XIV, § 1. "An essential component of a procedural due process claim is a protected property or liberty interest." *Minch v. City of Chicago*, 486 F.3d 294, 302 (7th Cir. 2007) (citing other sources). Liberty is not at issue here as March proceeds under a purported property interest. "To demonstrate a procedural due process violation of a property right, the plaintiff must establish that there is '(1) a cognizable property interest; (2) a deprivation of that property interest; and (3) a denial of due process.'" *Khan v. Bland*, 630 F.3d 519, 527 (7th Cir. 2010) (quoting *Hudson v. City of Chicago*, 374 F.3d 554, 559 (7th Cir. 2004)).

Here, it is clear that March is unable to establish the first element: a cognizable property interest. "[W]hether a particular job action against a public employee implicates a constitutionally protected property interest is a question of law." *Cole v. Milwaukee Area Tech. Coll. Dist.*, 634 F.3d 901, 904 (7th Cir. 2011) (citing another source). "In the employment context, a plaintiff generally is required to show that the terms of his employment provide for termination only for cause or otherwise evince mutually explicit understandings of continued employment." *Id.*

(internal quotation marks and citations omitted). In Wisconsin, "courts have generally resolved the matter . . . based on whether the employment is at-will or for cause." *Fittshur v. Vill. of Menomonee Falls*, 31 F.3d 1401, 1405 (7th Cir. 1994) (citing another source); *see also Bd. of Regents v. Roth*, 408 U.S. 564, 577 (1972) (holding that the existence of a substantive property interest in public employment is ordinarily a question of state law). "Employment which can be terminated only 'for cause' receives due process protections;" employment "at-will" does not. *Cole*, 634 F.3d at 904 (citing *Beischel v. Stone Bank Sch. Dist.*, 362 F.3d 430, 436 (7th Cir. 2004)).

It is clear that the terms of March's employment agreement did not create a property interest. By the terms of his agreement, March was employed for "an indefinite term" and he was "subject to removal at any time by two-thirds vote" of the Board, so long as, if without cause, he received 30 days' notice and, after the first three years, he received six additional months' salary and family health insurance coverage as severance compensation together with any accrued benefits at the time of termination. Dkt. No. 26-1 at 2–3. Wisconsin Statutes, which could confer a property interest, do not do so here. *Beischel*, 362 F.3d at 436 (citing *Larson v. City of Tomah*, 193 Wis. 2d 225, 532 N.W.2d 726 (1995); *Schultz v. Baumgart*, 738 F.2d 231 (7th Cir. 1984)). Section 17.13(1) of the Wisconsin Statutes provides that, in the absence of a contract, appointed town officials can be terminated "by the officer or body that appointed him or her, at pleasure." Where, like here, a body is the decision maker, "[r]emoval . . . shall be by a majority vote of all the members thereof." Wis. Stat. § 17.13(1).

March argues that when read in conjunction with Wisconsin's Open Meetings Law, Wis. Stat. § 19.85, his contract created a property interest entitled to due process protection. The Open Meetings Law, as a general matter, requires that government business be conducted in public. Wis. Stat. § 19.81(2). Section 19.85(1) provides that "[a] closed session may be held" for the purpose

28

of "considering dismissal . . . of any public employee . . . and the taking of formal action on any such matter; provided that the . . . public employee . . . is given actual notice of any evidentiary hearing which may be held prior to final action being taken and of any meeting at which final action may be taken." Wis. Stat. § 19.85(1). The statute goes on to state, "[t]he notice shall contain a statement that the [public employee] has the right to demand that the evidentiary hearing or meeting be held in open session." § 19.85(1)(b). March argues that Wis. Stat. § 19.85 creates a property interest because it gives a public employee the right to request that a meeting at which final action be taken be held in open session, thereby allowing the public to hear and comment on the termination decision.

March's argument has facial appeal, but a careful reading of § 19.85 reveals that it does not create a property interest. The statute envisions an evidentiary hearing when termination of a public employee is for cause. But when termination is not for cause, there is no need for an evidentiary hearing; there is no cause the Board is required to prove. Here, the Board was contractually entitled to terminate March's contract without cause by two-thirds vote of the Board, as long as he was paid the required severance in salary and benefits. Since the Board elected to terminate March's contract without cause and agreed to award him the required severance, there was no need for or right to an evidentiary hearing. Moreover, the final action terminating March's employment was taken in open session after the closed session ended. Dkt. No. 79-16 at 5.

March makes a further argument that the Board was required to provide notice that it was considering his dismissal even if it was to be without cause. He contends that had such notice been provided, he would have requested his dismissal be discussed in open session, which would have required the members to openly discuss their reasons for terminating his contract in his

presence and that of the citizenry. Had that occurred, March contends that at least English would have voted differently. Dkt. No. 110 at 25.

In fact, it was no mystery that the Board intended to consider termination of March's contract at the May 2, 2023 Board meeting. The agenda for the meeting, like the April 13, 2023 meeting, included as an item: "'[c]onferring with legal counsel for the governmental body who is rendering oral or written advice concerning strategy to be adopted by the body with respect to litigation in which it is or is likely to become involved,' to wit: to discuss the performance of the Town Administrator, confer with special counsel regarding the Town's rights and responsibilities under the employment agreement with the Town Administrator, review the Town's legal position in relation to the Administrator's counsel's correspondence and otherwise discuss the Town Board's legal position in relation to same." Dkt. No. 79-13 at 2. Even if this was not sufficient to comply with § 19.85(1)(b), it is difficult to see how that would support a due process claim. It has long been established "that procedural rights are not rights of liberty or property within the meaning of the due process clause." *Wikberg v. Reich*, 21 F.3d 188, 190 (7th Cir. 1994); *see also Lim v. Cent. DuPage Hosp.*, 871 F.2d 644, 648 (7th Cir. 1989) ("[A] contract that creates merely a right to procedure does not create a property right within the meaning of the due process clause."). Indeed, "[i]n order to give rise to a constitutionally protected property interest, a statute or ordinance must go beyond mere procedural guarantees to provide some substantive criteria limiting the state's discretion—as can be found, for example, in a requirement that employees be fired only 'for cause.'" *Jones v. City of Gary*, 57 F.3d 1435, 1440 (7th Cir. 1995) (quoting another source). Because § 19.85 provides no substantive criteria limiting the state's discretion to terminate public employees, it did not entitle March to his job as Administrator. And thus, March

30

can assert no property interest. Accordingly, March's Fourteenth Amendment due process claim fails as a matter of law.

## B. March's Motion for Summary Judgment on Wolff's Counterclaim

In his counterclaim against March, Wolff alleges that March violated his First Amendment rights by retaliating against him for speaking out against March. Wolff also alleges that March treated him differently from those similarly situated and March's actions were "motivated by a strong personal animus against [Wolff] and out of a spiteful effort to 'get' [Wolff] for reasons wholly unrelated to any legitimate state or municipal interest," in violation of Wolff's Fourteenth Amendment right to equal protection of the law. Dkt. No. 26 ¶¶ 160–61. March argues in his motion for summary judgment that both of Wolff's claims fail as a matter of law. He also asserts the defense of qualified immunity.

### 1. Wolff's § 1983 Claim for First Amendment Retaliation

To prevail on a claim under § 1983, a plaintiff must establish the violation of a right secured by the Constitution and laws of the United States and, in addition, show that the alleged deprivation was committed by a person acting under color of state law. *West v. Atkins*, 487 U.S. 42, 48 (1988). Wolff claims that March acted under color of state law to deprive him of his rights under the First and Fourteenth Amendments to the United States Constitution. Because March was not Wolff's employer or supervisor, Wolff's First Amendment claim against March is not the same as March's claim against Wolff. To prove a First Amendment retaliation claim outside the employment context, a plaintiff must ultimately show that (1) he engaged in activity protected by the First Amendment; (2) the defendant, in his capacity as a government official, subjected the plaintiff to a deprivation that would likely deter First Amendment activity in the future; and (3) the First Amendment activity was a but-for cause of the defendants' decision to take the retaliatory action.

31

*Hartman v. Moore*, 547 U.S. 250, 256 (2006); *Bridges v. Gilbert*, 557 F.3d 541, 546 (7th Cir. 2009).

Wolff contends that he engaged in constitutionally protected speech when, over the course of the years 2018 and continuing into 2021, he made public statements calling for March to be fired. He argues that the evidence is sufficient for a jury to find that March retaliated against him by failing to bring to his attention, or the Board's, the fact that his bid on behalf of Lake Shore for the Champion Pond Project might constitute a violation of Wis. Stat. § 946.13(1)(a), and thereby setting him up for a criminal investigation. Instead of bringing the matter to the Board's attention, Wolff argues that March reported the alleged violation to Agent Yerges in the hope that Wolff would be prosecuted and ultimately removed from the Board. Wolff contends that March's conduct caused him to be subjected to a wide-ranging criminal investigation, unreasonable searches of his home and businesses and seizure of his properties, and a criminal prosecution, resulting in emotional distress, loss of reputation, humiliation, and embarrassment, as well as substantial attorneys' fees.

The first question that arises is whether Wolff's political discourse is constitutionally protected in the same sense as that of an unelected citizen or non-policymaker government employee. Wolff is an elected official and thus does not stand in the shoes of a mere citizen against the power of the government. Instead, Wolff, as an elected official, is a person who wields such power, at least as far as March is concerned. As this court noted in a similar case, "neither the First Amendment, nor § 1983, was intended to shield politicians from the political process itself. . . . As the fictional Mr. Dooley observed long ago, 'Politics ain't beanbag.'" *Footit v. Van De Hey*, No. 04-C-459, 2005 WL 1563334, at *4 (E.D. Wis. June 29, 2005). Other courts have reached similar results, as this court explained in *Footit*.

In *Romero-Barcelo v. Hernandez-Agosto*, for example, the former governor of Puerto Rico, having lost his bid for re-election, brought a § 1983 suit against elected members of the Puerto Rico Senate from the opposing political party, alleging that they violated his First Amendment rights by "rigging" legislative hearings to make it appear that he was involved in illegal activity and continuously labeling him as an assassin or murderer in public statements to the press, and on radio and television, in an effort to undermine his popularity with the electorate. 75 F.3d 23, 26–28 (1st Cir. 1996). The First Circuit affirmed the district court's dismissal of the action on the ground that the defendants enjoyed absolute legislative immunity for statements made and actions taken in the course of the legislative hearings. *Id.* at 32. As to claims not barred by legislative immunity, the court upheld the district court's finding that there was "no First Amendment protection for 'a politician whose rights to freedom of speech, freedom of association, and freedom to disassociate [oneself] from unpopular views have been injured by other politicians seeking to undermine his credibility within his own party and with the electorate.'" *Id.* at 34 (alteration in original) (quoting *Barcelo v. Agosto*, 876 F. Supp. 1332, 1348 (D.P.R. 1995)).

Likewise, in *Camacho v. Brandon*, the Second Circuit held that the termination of a City Council staffer because of the exercise of First Amendment rights by the opposition member with whom the staffer had a close professional and personal relationship was not actionable under § 1983 as a retaliatory discharge. 317 F.3d 153, 163 (2d Cir. 2003). Although the court found that the staffer had standing to assert the First Amendment rights of the council member who was allegedly retaliated against, it rejected the plaintiff's claim that such retaliation was actionable. *Id.* at 160, 163. In First Amendment retaliation cases, the court held, "there generally is no First Amendment violation when the plaintiff is a policymaker." *Id.* at 161. "Indeed, to hold

otherwise," the court noted, "would subject to litigation all manners and degrees of politically motivated, retaliatory conduct directed at public officials." *Id.* at 162.

As in *Footit*, the same principle applies here. As an elected public official, Wolff is not entitled to sue his political opponent just because he thinks his motivation for accusing him of misconduct was not pure. While Wolff is free to sue March in state court for libel or slander if March intentionally or recklessly defamed him, that is not what Wolff has claimed here. His claim is that March was trying to politically harm him because he opposed Wolff's policies. That may be true, but because Wolff is a policymaker, the motivation of his political opponents is irrelevant. As this court noted in *Footit*, this is not to say that government officials, such as Wolff, have forfeited their First Amendment right to speak out on issues of public concern. *See Bond v. Floyd*, 385 U.S. 116, 135–36 (1966) ("The manifest function of the First Amendment in a representative government requires that legislators be given the widest latitude to express their views on issues of policy."). But as a policy-making official, Wolff's vindication against his opponents, absent proof of libel or slander, must be found at the ballot box, not in the courts.

Wolff's claim against March also fails because March did not, under color of law, take material adverse action against him. To support a First Amendment retaliation claim, the adverse action must be "material;" that is, it must "deter a person of ordinary firmness from exercising First Amendment activity in the future." *Bridges*, 557 F.3d at 555; *see also Houston Cmty. Coll. Sys. v. Wilson*, 595 U.S. 468, 479 (2022). The materiality inquiry takes special consideration of whether the party complaining of retaliation is an elected official because our country "expect[s] elected representatives to shoulder a degree of criticism about their public service from their constituents and their peers—and to continue exercising their free speech rights when the criticism comes." *Wilson*, 595 U.S. at 478; *see also Monitor Patriot Co. v. Roy*, 401 U.S. 265, 277 (1971)

(holding that even a false charge of criminal conduct against an official or candidate is constitutionally protected unless it is made with knowledge of its falsehood or with reckless disregard of whether it was false). More to the point, "[w]hen individuals 'consent to be a candidate for a public office conferred by the election of the people,' they necessarily 'pu[t] [their] character in issue, so far as it may respect [their] fitness and qualifications for the office.'" *Wilson*, 595 U.S. at 478 (alterations in original) (quoting *White v. Nicholls*, 3 How. 266, 290 (1845)). Even being accused of a crime is not out of the ordinary in the world of politics, as the current President of the country could attest. *See also Footit*, 2005 WL 1563334, at *4 ("But Footit is hardly the first politician to be accused of a crime by a political opponent.").

Though March could have warned Wolff and the Board that Wolff's bid on the Champion Pond Project might violate § 946.13, assuming March realized it himself at the time, Wolff was ultimately responsible for his own conduct. March was not legally responsible for the DCI investigation or resulting criminal charges. Gehring filed the complaint, Agent Yerges investigated, and the state Attorney General's office prosecuted the matter. While March also provided Agent Yerges information, it was not clear he was acting under color of law when he did so. *See Polk Cnty. v. Dodson*, 454 U.S. 312, 324 (1981) (holding a public defender representing an indigent defendant did not act under color of state law). In any event, at each step, an independent actor exercised his own judgment and concluded to continue forward. Findings of probable cause were made by judicial officers to support both the issuance of the search warrant authorizing the search of Wolff's properties and the criminal charge on which he was prosecuted. *See Hartman*, 547 U.S. at 265–66 (holding a plaintiff in a retaliatory-prosecution case must plead and show the absence of probable cause for pressing underlying criminal charge). More to the point, Wolff signed off on the Champion Pond quote before engaging March or any other Town

35

official.  Because the *actus reus* under Wis. Stat. § 946.13(1)(a) includes "bid[ing] for . . . a contract in which the officer or employee has a private pecuniary interest," Wolff subjected himself to future investigation and prosecution before March even was aware of his conduct.  For this reason, as well, the court will grant March's motion for summary judgment and dismiss Wolff's First Amendment retaliation claim.

Alternatively, the court concludes that March is entitled to qualified immunity as to Wolff's First Amendment retaliation claim.  Whether March's silence in the face of Wolff's bid on the Champion Pond Project was part of a plan to set Wolff up for criminal prosecution or simply an oversight not unlike that of the entire Town staff and Board, Wolff has cited no authority that would support the conclusion that such silence could violate clearly established federal law and thereby subject March to monetary liability.  For this reason, as well, March is entitled to summary judgment on Wolff's First Amendment claim against him.

### 2. Fourteenth Amendment Class of One Claim

A plaintiff seeking to bring an equal protection claim as a "class of one" must show (1) he "has been intentionally treated differently from others similarly situated," and (2) "that there is no rational basis for the difference in treatment."  *Vill. of Willowbrook v. Olech*, 528 U.S. 562, 564 (2000) (per curiam); *accord McDonald v. Vill. of Winnetka*, 371 F.3d 992, 1001 (7th Cir. 2004). March argues that Wolff's claim is foreclosed by *Engquist v. Oregon Department of Agriculture*, wherein the Supreme Court held that "a 'class-of-one' theory of equal protection has no place in the public employment context."  553 U.S. 591, 594 (2008).  March also argues that Wolff has failed to produce any evidence from which a reasonable jury could find he was treated differently from other similarly situated individuals.  The court need not decide whether Wolff has sufficient evidence from which a reasonable jury could find he was intentionally treated differently from

36

other similarly situated individuals. For *Engquist* makes clear that his class of one equal protection claims fails.

In *Engquist*, the Court recognized that "there are some forms of state action . . . which by their nature involve discretionary decisionmaking based on a vast array of subjective, individualized assessments." 553 U.S. at 603. In those type of cases, the Court noted, "the rule that people should be 'treated alike, under like circumstances and conditions' is not violated when one person is treated differently from others, because treating like individuals differently is an accepted consequence of the discretion granted." *Id.* The Court held that allowing a challenge based on the arbitrary singling out of a particular person in such situations "would undermine the very discretion that such state officials are entrusted to exercise." *Id.*

The Court then concluded that this principle "applies most clearly in the employment context, for employment decisions are quite often subjective and individualized, resting on a wide array of factors that are difficult to articulate and quantify." *Id.* at 604. "The close relationship between the employer and employee, and the varied needs and interests involved in the employment context, mean that considerations such as concerns over personality conflicts that would be unreasonable as grounds for 'arm's-length' government decisions (*e.g.*, zoning, licensing) may well justify different treatment of a public employee." *Id.* And "unlike the context of arm's-length regulation, such as in *Olech*, treating seemingly similarly situated individuals differently in the employment context is par for the course." *Id.* In summary, the Court concluded:

> the class-of-one theory of equal protection—which presupposes that like individuals should be treated alike, and that to treat them differently is to classify them in a way that must survive at least rationality review—is simply a poor fit in the public employment context. To treat employees differently is not to classify them in a way that raises equal protection concerns. Rather, it is simply to exercise the broad discretion that typically characterizes the employer-employee relationship. A

challenge that one has been treated individually in this context, instead of like everyone else, is a challenge to the underlying nature of the government action.

*Id.* at 605.

In light of *Engquist*, Wolff's "class of one" equal protection claim must fail. This theory of liability simply has no application and is not cognizable in the public employment context. Accordingly, summary judgment will be granted, and Wolff's equal protection claim will be dismissed.

## CONCLUSION

For the above reasons, Defendants' motions for summary judgment on March's claims against them (Dkt. Nos. 42 & 83) are **GRANTED**. March's motion for summary judgment on Wolff's counterclaims against him (Dkt. No. 81) is likewise **GRANTED**. The action is therefore dismissed, and the Clerk is directed to enter judgment accordingly.

**SO ORDERED** at Green Bay, Wisconsin this 8th day of April, 2025.

William C. Griesbach
United States District Judge